Case 17-2153, Mr. Armijo and Mrs. Zubrick. Good morning, your Honors. I have pleased the Court. My name is Roberto Armijo, and I'm here as the lawyer for Clay, I'm sorry, Clay Sheff. The purpose that I'm here today is to ask the Court to review the judgment of the trial court dismissing Mr. Sheff's petition for judicial review and for declaratory relief stemming from the final decision of the United States Department of Justice trial court's in the order granting their motion to dismiss. The issues in this case are, number one, whether Department of Justice exclusion of Mr. Sheff's in utero physical presence in a designated downwind geographic area as the basis for denial of his claim is based on a permissible construction of the Radiation Exposure Compensation Act, and number two, whether the district court's analysis of the rules governing judicial review of an agency's construction of a statute it administers is sufficient to sustain DOJ's interpretation of RECA downwinder eligibility. And this case basically looks at these questions from the standpoint of the Chevron case, which is whether an interpretation of the statute, number one, is necessary, and if so, whether the conclusion is reasonable. We contend that, yes, the Department of Justice was delegated authority, but that the conclusion is not reasonable, and therefore the actions by the administration and by the Court need to be set aside. Now, I think that we need to take a look at some of the law dealing with how we go about getting to the determination of this issue. This boils down to a question of how you define the term individual, which seems to be at the core of the dispute between the parties. I can recognize the prowess. For starters, this is, as you said, a determination on our – it's called for on our part as to whether this is a permissible construction under Chevron. Yes, sir. And there are some statutes that provide for in utero coverage and other statutes that speak about children or other words that may raise a question as to whether in utero coverage is permissible construction. What is it about this case that under the reading of the statutory scheme that you say makes it an impermissible construction under Chevron? Well, I would start my answer by pointing out that the number one thing that needs to be done in construing the statute is to look at the purpose of the statute, the history of the statute. What was Congress trying to do here? And to start from that premise, the Radiation Exposure Compensation Act had some pretty powerful statements in the preface that led to it. Congress admitted that detonating atomic bombs in Nevada had a tremendously adverse effect on downwind people, on people who participated, and it also included some information on uranium miners. Now, looking at the history of that, I think, is what distinguishes this somewhat from those other cases. We have here no definition, one way or the other, of whether in utero physical presence for a downwinder applies or not. And the statute is silent on that, the district court found. The regulations are silent. Now, the administration was called upon to develop regulations, which they did, but they did not specifically address this. So here, this statute, first of all, has got some powerful statements that to me would seem to justify in utero recognition. But after those powerful remedial statements, Congress had to put black to white, they had to put pen to paper, and in that regard, they developed pretty detailed requirements for who would qualify and who wouldn't qualify, right? It's not like they said, now let's throw open the doors and let everybody get it because there has been a harm done here. So why doesn't that suggest that Congress knew what it was doing, and so when it wanted somebody to get relief, it specified they'd get relief, and they didn't say anything about in utero. Well, I think that when you look at the statute, you're dealing with, you need to look at the context of each of those three different places, and I agree with what you've said, Your Honor. Certainly, Congress spelled things out, and as the Department of Justice has pointed out, with some specificity. But when you're looking at the on-site participants, you're looking at a criteria where the people have to participate to be eligible. When you're looking at the uranium miners, you're looking at a situation where the people have to have worked for a specific period of times. When you're looking at the question of in utero, I'm sorry, when you're looking at the question of downwind, all that's needed is physical presence in the affected area during the period of time specified. All right. Now, assume that. Now, is there a case that we're going to be using here, is your home visiting nurse service, is that correct? It's one of them. Well, what case, well, let's talk about that one first, and then I'd like to, now, that case basically says that if a statute is silent or ambiguous, and I take, which one are you arguing, the silent or the ambiguous? It's silent, and that makes it ambiguous. All right. So, you're saying that the, if the statute is silent and therefore ambiguous, the question for us is whether the agency's answer is based on a permissible construction of the statute. Now. Correct. All right. Now, let's, I'll give you an opportunity to argue other cases, but I'm stating on your home visiting nurse case, what about this interpretation made under Chevron is impermissible? Why is it impermissible? Well, there are several reasons. First of all, the statute includes a provision that indicates that every reasonable doubt essentially should be indulged in favor of the claimant, and I recognize this is an evidentiary ruling, but it also, it says something about how these cases should be decided. In addition, looking at the definition itself, and as the district court found, all of the tenets of statutory construction don't point in one direction. Some may favor what the Justice Department concluded. Some would favor what Mr. Sheff does. But how does that help you? It seems to me that that cuts against you. Well, it could in some respects. However, when you look at some additional things, I think that it essentially ends up cutting in my favor. If you look at the Dictionary Act, for example. Now, we're talking about whether the question of a reasonable outcome is correct or not. DOJ points to part of that statute, and the part they point to is the section that says, well, an individual means a born individual. And in fact, in the case of the United States v. Montgomery, it was discussed, and all that the court had to get to there was the question of whether this rather odd situation were the accused of that murder. The sequence was that the death happened before the taking of the baby across state lines, and therefore you couldn't have a criminal prosecution for a murder in the course of a kidnapping because the murder happened before the, quote, kidnapping and taking across state lines. The court didn't have to get to the question of that third section of the Dictionary Right statute, which basically talks about not expanding or contracting any of the rights that an individual might have in comparison to when you look at a fetus or an unborn person. And I think if you take that entire statute and not just parse out the first section and flow its intent into this question of what it means to be an individual in the context of the Radiation Exposure Act for downwinders, you come to the conclusion that the individual, who would have that right, Mr. Sheff, an individual, whether he was in utero or not in utero, you can't distinguish those two. So essentially, I think that that particular analysis of the Dictionary Act supports my position that it is covered. And I'm not sure if I'm answering the court's question fully, but another point I'd like to make on that is deference, of course, is due to the Justice Department to carry out this statute. But the deference doesn't extend to their interpretation of the Dictionary Act, which if applied in full to this, I think would support our position that Mr. Sheff, indeed, his in utero exposure should be recognized. You acknowledged, I think, earlier on that the 6B1, I think the term you used, is an evidentiary rule. And if it is an evidentiary rule, then how does that really help you? I mean, the fact that you're supposed to, well, how does that help you? Well, you're adding that to the overall context of what we're dealing with. You've got a very graphic set of descriptions in the start of the statute about this problem that needs to be dealt with. Yeah, but there's not a factual dispute here that's being addressed. No, no, there's not a factual dispute. So if it's an evidentiary rule, there is no factual dispute, then why is it relevant? Well, the issue has to do with the interpretation of the statute. And I think that when you look at the entire fabric of the statute, it supports the notion that there should be a recognition of the in utero physical presence. And I think that's the sense that I would put on that. Do you accept the premise that, I mean, if we're at Chevron Step 2, if there's a jump ball here, I mean, if things are in equipoise, you lose, right? I might. I'm not going to be evasive about it. If it gets there, then sure, we lose. Okay. And I think we need to answer, I need to answer the question correctly. But take a look at the context in which the issue of in utero exposure arises. If you look at all the cases, practically all of them come before the courts in an environment that's rich with facts in comparison to this case. If you're looking at tax cases, if you're looking at environmental cases, if you're looking at Medicare cases, or if you're looking at cases involving immigration issues, you've got a lot of regulations that are published. Here we don't have any regulation on this. In addition, if you're looking at these other areas, you see a history of reported administrative decisions over time, court cases. Here, under the uncontroverted facts, as they may apply to the issue of statutory construction and as applied to the deference, it's admitted that all of the decisions that were ever made, we don't know if it's one, five, ten, a hundred, have never been publicly published because of issues of privacy. How would Congress know about these? In the 2000 amendments, there was one page mentioned in the briefing that had one reference to in utero, nothing but that Congress on notice about the fact that there was a history of denying claims of this nature. When the Congress commissioned a report on this, there was a report, and the record has been expanded a bit on that in this court. There was in 2005 a statement, okay, that the government is not approving in utero exposure, but since that time, even though there have been a number of introduced proposed legislation, there has been no new legislation since 2002, no new legislation since 2005. And when you look at the proposals that have been mentioned in the briefs by both sides, the utero has never been presented. So I'm going to reserve some of my time for rebuttals. You are reserved. Yes, sir. I don't mean to be abrupt, incidentally, when I say reserved. I just want to clock stop for you. Thank you. It's an act of kindness, not abruptness. Okay. May it please the Court, Carleen Zubricki on behalf of the Department of Justice. With RICA, Congress created a streamlined payment program for three groups of individuals. Individuals who are physically present in certain geographic areas for certain durations on certain dates, individuals who were employed in the uranium industry, and individuals who participated on site. You know, when Congress enacts this type of a payment program with no causation requirement whatsoever, you know, necessarily there are going to be unsatisfying bright lines in different places. And what the Department of Justice does is it does its best statutory interpretation to faithfully identify where Congress drew those lines. Is there any indication in the history leading up to the adoption of the Act that there was any recognition one way or another about in the in utero situation, whether that was contemplated or rejected, or whether it was not contemplated at all, that would allow us to conclude that physically present meant something? Sure. So my recollection is that in the legislative history leading up to the original passage of the Act in 1990, there's maybe a stray reference to pregnant mothers or in utero, but I don't believe there was any kind of a sort of full-throated discussion or sort of particularly definitive legislative history. I will say that in the mid-90s, there was a report. It's called the Beers Report, the Biological Impact, the Biological Effect of Iodized Radiation Report. And in that report, there was a significant discussion of in utero, the in utero phase and sort of possible risks to it. Congress sort of was expressly relying on that report when it expanded other aspects of RICA in 2000. So this report came out in the 90s and then in 2000, Congress expanded the geographical requirements and various disease requirements for RICA, but it did not do anything with respect to the in utero phase. And as we pointed out, sort of since then, there's also been sort of this other report in 2005 that very clearly was not a single page. There's a substantial discussion of the in utero phase in that 2005 report, and Congress has not done anything since that. But again, you know, to the extent that I take some of Your Honor's questions, to the extent that there is any ambiguity here, we do think that Congress's intent in the statute is clear. But even if there were any ambiguity, there certainly has been nothing pointed to here that we think would justify setting aside that considered determination. Well, we do not have to get into existential questions of life and the hot button controversial issues in this case to say that Congress did intend, that had Congress chosen to do so, they could have very clearly said we extend these benefits to pregnant women, to after-born children, whatever. Certainly, Your Honor. And indeed, Congress has done that in a number of statutes, including, I think, the relatively similar Vaccine Injury Act, which is a similar sort of... Are there any acts that pre-exist this, the adoption of this act, where Congress acknowledged implicitly that they could extend the benefits to an embryo situation? I'm not aware of any of that pre-date recap. I will say that the 2004 act with respect to, I'm blanking on the name of the act, the Abort Victims of Violence Act was 2004, which is relatively close in time to the 2002 significant amendments to RICA. But you're right that I'm not aware of any acts that pre-date this. We're not really situated, are we, to rely upon this long-standing, quote, long-standing interpretation of denying in utero claims when there's nothing in the record that would allow us to validate that, right? Sure. We're not asking, this was decided at the motion to dismiss stage, we're not asking this court to adopt some sort of a full-throated ratification theory or anything like that. I mean, the administrative decisions here do clearly indicate, you know, they state that the department has consistently rejected claims on this basis, and, you know, that is the case, but I do understand that those documents are not presently before the court. So we're not situated to infer that Congress would have been aware of that long-standing interpretation? I mean, there is a presumption that Congress is aware of agency interpretations of acts. I recognize that in the early phases of RICA, there's not clear written documentation of the department's interpretation, but certainly as of at least 2005, there is very clear, you know, Congress was informed in a report that specifically said the Department of Justice is interpreting the statute this way, and that report has been relied on by Congress in introducing other legislation since then. Well, yeah, but the significance would lie in when there was an amendment, Congress would be aware of some interpretation, and therefore, I mean, the principle of statutory interpretation goes to the question of Congress let it alone because it was aware that this was the state of the law, or it changed it because it was aware this was the state of the law. But if there's no published history of this long-standing interpretation, then Congress has nothing to rely on, does it? Sure. I mean, as of the time when Congress last amended the statute, we agree there was nothing written. Again, this was not, you know, a secret interpretation. There were claims being denied on this basis before that point, and it's certainly plausible that Congress would have heard about it from constituents and at town hall meetings and that sort of thing, but there was nothing in the record. The point of our argument about the long-standing interpretation is just that, you know, I don't think there's any rule that you only consider the fact that an interpretation is long-standing when Congress has subsequently changed the legislation. I think it just goes to the overall weight, the fact that this is a persistent interpretation and it's not something that sort of has been, you know, suddenly or recently changed or anything like that. You know, this is how the Department has understood this statute for several decades now. Counsel, could I get you to address the language of the statute? Of course. As I understand, I think you make Chevron's step one argument. Could I get you to turn to that? Sure. We do think basically, I mean, Chevron's step one, we're looking at the text of the statute, but also considering the overall context here. And the statute refers to an individual. If you actually, if you look at Section 4 of RICA, which addresses the downwinders we're talking about here, as well as the on-site participants, this is at A3 in the appendix to our brief, but what it actually says is that an individual who A, was physically present in certain places at certain times, B, was physically present at other points in time, or C, participated on-site. And there's a separate provision that refers to individuals who were employed in uranium mines. And we do think that sort of, taking just the ordinary meaning of the phrase, an individual who was physically present as it would be used in common parlance, you know, we think that that's relatively clear, but we certainly think that when you take kind of the three parts of the statute, these three categories of individuals, it simply confirms that Congress was referring to natural-born humans, people who could be in these categories. And it would be surprising if Congress had sort of sub silencio, created this significantly expanded coverage for the downwinders, the physically present requirement, when it did not similarly, you know, do anything for the uranium miners or the on-site participants, with respect to whom Congress was obviously especially concerned with their exposure. Well, that's not before us, though, right? I mean, why do we know that's not the case? I mean, why couldn't somebody who was a uranium miner, a woman who had, whose child was later born with a condition, why couldn't she make a claim? I think if you read the text of the statute, I have, thank you. So my understanding, in my view, in any event, the phrase, an individual who was employed in a uranium mine, does not encompass, you know, there's like a, somebody during the in-utero phase of their life could not qualify as an individual who was employed in a uranium mine, or an individual who participated on-site. And the Department sort of considers that when it sort of assumes that Congress intended to treat these three groups similarly. And again, Congress could create an expanded coverage for this group, but the Department's understanding is that it has not done so. If in-utero is deemed to be coterminous with the person that they are with, then why couldn't those same conditions apply to them? In other words, uranium miner employed, I mean, why is that self-evident? It's not self-evident to me that it couldn't be that way. Especially, I think, the most natural reading of the phrase, an individual who was employed in a uranium mine would refer to the sort of adult worker. It does refer to the person who signed up to be employed, but that's not to say, the question is, is that the only person it applies to? Especially, even if there is some ambiguity on this point, we certainly don't think that it's entirely clear from the statute that it would have intended to cover those other groups. So do I hear you abandoning your plain meaning argument? I need help here. Sure, we do think that the statute is unambiguous, but we also, to the extent that the court thinks that there is any ambiguity here, we are also making a Chevron Step 2 argument here. It's for many of the same reasons. It's that the Department, which has long administered the statute, when it looks at the various condition of congressional intent, it's best understanding about that is that Congress did not intend to cover. Could you just help me understand your argument? On Step 1, what are you looking at? Are you just making the argument that Congress used the term individual, so it was envisioning individuals who could do these things, right? I mean, that's kind of focusing on that provision, but are there other statutory interpretation principles that you rely on? Sure, so we're looking at, yes, so we're looking at the plain text. We're looking at the dictionary definitions. We do think that the Dictionary Act is certainly consistent with our understanding here. And then we're taking the structure of the Act, where Congress enacted these three apparently very similar provisions to cover three groups of people, and we think that Congress would have been clearer. I understand that we think Congress would have been clearer had it intended to draw a distinction with the dominant. I don't believe Mr. Schiff disputes that the other categories of individuals would not be covered under the plain text of the Act. So those are sort of two primary things. We also think that there is sort of an additional level of weight that should be accorded to the Department's interpretation because it is a... Well, okay, so stop there. So those are the, that, you're looking at that provision that has individual plus how the statute's structured. How about the fact that Congress has spoken elsewhere specifically when they refer to in utero? I mean, is that step one? I think that that is a I think that that's also available as step one. I think that's a traditional tool of statutory interpretation, the way that Congress has approached this question in similar statutes, and in similar statutes, Congress has expressly provided coverage for the utero phase, and it has not done so here. Okay, and is that it? I guess are you done with your step one argument? I, yeah, I guess the one thing I would add to that is that I do also think that this is a very, this is a statute that's drawn at a very high level of granularity, and we do think that that's an extra reason to think that Congress would have specified something here if it intended for a sort of this additional coverage. When you were ticking off the step one factors, though, you mentioned the weight of the that should be accorded to the Department. I, that was, now that you say that, that was, I should not have said that there. That would be a step two. The sort of the weight according to this would be a step two. Okay. Is that intended to deprive the benefits of the statute to children born to somebody who has had genetic change because of having been exposed? For example, if you have a uranium miner or somebody who has been exposed to physically exposed to radiation from atomic testing or whatever, and that individual proceeds to have offspring, the benefits of the statute do not extend to the offspring. That's correct. There's the requirements of the statute are. That basically cuts it off and that generation cannot be extended to the offspring of that generation. I just want to make sure I understand your Honor's question. I don't think that any of the three provisions of the statute provide coverage for sort of a generation beyond the individuals that the statute is describing. I don't think the physical presence requirement doesn't sort of circle back to do something with respect to the on-site participants or the uranium miners. They're just three separate avenues for recovery. You correctly interpreted my question. If there are no further questions. Just a second. We'd ask the court to affirm the decision of the district court. Thank you. Thank you. Thank you for yielding your remaining time. I'll try to be very brief in my rebuttal remarks. In regard to the deference, in this case it's different from most of the cases because there really isn't a fact-rich background to see how the deference should be applied. There simply isn't anything. Secondly, when you come to the 2005 report, if you concede, okay, Congress was told, there has not been any reenactment since that time. Furthermore, when this spattering of no one has brought any of that up after that time, and why would Congress, somebody born a little before this period of time, be treated differently when they get older, like Mr. Sheff, and get cancer, be different when they were undeniably present in utero, and that individual later on contracted cancer. And look at the, I simply ask the court to consider the dictionary tact in total. Thank you. Thank you, counsel. The argument is well understood and the case is well presented. We compliment counsel and the case is submitted and counsel are excused.